UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON MARIE SALADO,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | No. 1:22-cv-1248-TLN-GSA<br><br>**FINDINGS AND RECOMMENDATIONS TO GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, TO REMAND FOR FURTHER PROCEEDINGS, AND TO DIRECT ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**<br><br>**(Doc. 17, 19)** |

### I. Introduction

Plaintiff Shannon Marie Salado seeks judicial review of a final decision of the Commissioner of Social Security denying her application for social security disability insurance benefits pursuant to Title II of the Social Security Act.[1]

### II. Factual and Procedural Background

In the initial application Plaintiff alleged a disability onset date of February 12, 2016 (this was later amended by Plaintiff to February 12, 2017). AR 208. The Commissioner denied the applications initially on February 1, 2019, and on reconsideration on April 3, 2019. AR 107, 113. Plaintiff appeared for an initial hearing before an ALJ on May 12, 2020, which was continued for Plaintiff to obtain counsel. AR 70–76. A second hearing was held on July 2, 2021. AR 41–69. The ALJ issued an unfavorable decision dated July 9, 2021. AR 20–40. The Appeals Council

---

[1] The parties did not consent to the jurisdiction of a United States Magistrate Judge. Doc. 8, 10.

1

denied review on May 10, 2022, and this appeal followed. AR 9–14.

### III. The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-

(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f). While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

**IV.    The ALJ's Decision**

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of February 12, 2017. AR 25. At step two the ALJ found that Plaintiff had the following severe impairments: schizoaffective disorder, bipolar type; delusional disorder; depression; anxiety; obesity and scoliosis. AR 25.

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 26–28.

Prior to step four, the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: occasional postural activities; receive, comprehend, and execute simple routine tasks; no public contact; occasional contact with coworkers and supervisors; no assembly line work or tandem tasks; no hourly production quotas though daily quotas are permissible. AR 26–33.

At step four the ALJ concluded that Plaintiff could not perform her past relevant work as a real estate property manager or administrative assistant as actually or generally performed. AR 33–

34. At step five, in reliance on the VE's testimony, the ALJ found that Plaintiff could perform other jobs existing in significant numbers in the national economy at the light exertional level, namely: housekeeper, mail clerk and document specialist. AR 34–35. Thus, the ALJ concluded that Plaintiff was not disabled since the alleged onset date of February 12, 2017. AR 35.

V. **Issue Presented**

Plaintiff asserts two claims of error: **1-** the ALJ erred in failing to consider a closed period of disability; **2-** the ALJ failed to include work-related limitations in the RFC consistent with the nature and intensity of Plaintiff's limitations and failed to offer legitimate reasons for rejecting Plaintiff's subjective complaints.

A. **Closed Period of Disability**

1. **Legal Standard: Durational Requirement; RFC Generally**

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months[2]. 42 U.S.C. § 1382c(a)(3)(A).

Before proceeding to steps four and five, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and

---

[2] There is little dispute that this applies equally to any discrete 12-month period of disability within the period under review, and this is so even if the evidence does not support a disability finding for the entirety of the period under review given the plain language of the Act's durational requirement ("*a* continuous period of not less than twelve months")—in addition to authority in unpublished district court opinions.

4

resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995). "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

## 2. **Analysis**

### a. **Background**

Plaintiff contends the ALJ failed to adequately consider records which she believes establish a closed period of disability dating from August 16, 2018 to January 30, 2020. MSJ at 13–16, Doc. 17.

Briefly by way of background, prior to Plaintiff's August 16, 2018 inpatient admission, Plaintiff's primary care physician, Dr. Aghaie at Apex Medical Group, diagnosed and treated her anxiety with Lexapro in addition to managing other conditions such as psoriasis, obesity and back pain. *See generally* Ex. 2F, 5F, 9F (AR 383–427; 519–561; 761–820).

On August 16, 2018, Plaintiff's mother took steps to have Plaintiff admitted to a behavioral health facility, Marie Green Psychiatric Center, pursuant to a 5150 hold for three days due to delusions, auditory hallucinations and associated aberrant behavior including locking herself in a gas station office until the police removed her. AR 429–435.

Thereafter, Plaintiff visited Merced Mental Health for psychiatric medication management and therapy (*see generally* Exs. 3F, 4F, 6F, 8F; (AR 428–499; 500–518; 562–608; 614–760)).

Although she continued visits with her primary care physician Dr. Aghaie, it appears that Marie Green Psychiatric Center, and subsequently Merced Mental Health, took over the psychotropic medication management, including discontinuing Lexapro and starting antipsychotics such as Zyprexa, Geodon and Vraylar, which will be discussed in more detail below.[3]

### b. Discussion

Plaintiff emphasizes the following records during her inpatient stay at Marie Green Psychiatric Center, was well as her follow ups thereafter at Merced Mental Health:

> **1-** August 16, 2018 inpatient exam: guarded behavior, agitated motor activity, poor insight, poor judgement, auditory hallucinations and de-realization, pressured and excessive speech, various mood abnormalities, and exaggerated affect (AR 438–39), corresponding diagnoses of delusional disorder, grandiose type, with bizarre thought content, multiple episodes, currently in acute episode (AR 429); **2-** August 17, 2018 inpatient examination: continued paranoid delusions, auditory hallucinations (AR 446); **3-** August 19, 2018 inpatient exam: continuous mood changes, delusions, poor insight and judgment, and speech abnormalities (rapid, emotional, exaggerated, excessive, and loud) (AR 450); **4-** August 23, 2018 exam: delusions, auditory hallucinations, grandiosity, severe mood swings, excessive speech, paranoia, shuts down, tangential; **5-** similar findings at August 27, 2018 and September 10, 2018 follow ups (AR 485; 488).

Following Plaintiff's inpatient stay, Plaintiff points to the following records from Merced Mental Health psychiatry/medication management visits and therapy visits:

> **1-** October 29, 2018 medication management visit: hyper-verbosity, racing thoughts, delusions, diagnoses of bipolar disorder, mixed with psychotic features vs schizoaffective, and prescription for Geodon 20mg (AR 491); **2-** December 3, 2018 therapy visit: depressed, steady, emotionless (AR 495); **3-** December 7, 2018 medication management: mania and psychotic symptoms improved quickly on Geodon, she was no longer talking about communicating with spirits, but her depression had worsened as the mania resolved which the clinician assured her was often the case with bipolar, and they would try Wellbutrin for depression (AR 497–98); **4-** January 4, 2019 therapy notes: tired, sad, blank stare, teary eyed, emotional, per mother Geodon helped with mania but brought her down to a 10 where she was

---

[3] See AR 464 (August 20, 2018 discharge treatment plan from Marie Green Psychiatric Center noting "discontinue lexapro to avoid iatrogenic mania. Start Zyprexa 20mg po QD after dinner. Benadryl 50mg po BID prn for sleep/EPS/anxiety."); AR 511 (January 23, 2019 progress note from Merced Mental Health noting "in the past she used Lexapro ( SSRI) that benefited her for about 2 years prior to hospitalization, discussed Zoloft, (SSRI) more targeted for depression whereas Lexapro was anxiety, patient stated that she no longer feel anxious . . . patient stated that [she] was open to possible Zoloft, will consult with MD in 2 weeks when patient is to follow up to see if full month of Vraylar made a difference for her. Patient agreed with plan.").

stuck (AR 507); **5-** January 8, 2019 psychiatry medication management: complained of sleep disturbance, lack of ambition to get out of bad or do household activities, Wellbutrin and Geodon were discontinued and Vraylar was added (AR 509); **6-** January 23, 2019 psychiatric medication management visit: no change with Vraylar per patient, increasingly depressive, clinician proposed Zoloft for depression as a better alternative than Lexapro and patient was open to it (AR 511); **7-** January 28, 2019 therapy notes: sad, tearful, flat affect, blank stare, low energy, no interest in doing things though she did spend time with children, her husband left her due to severity of her emotional state (AR 513); **8-** February 6, 2019 psychiatric medication management visits: mother reported medication working well, MSE showed appropriate affect, smiling, flat affect disappearing, more involved in household activities, helping with children, journaling (AR 515); **9-** February 26, 2019: same (517); **10-** March 12, 2019 medication management visit: symptoms the same with no changes, tired all the time, MSE noted tearfulness; **11-** On March 9, 2019 medication management visit: continued symptoms of bipolarity, worried, sad, depressed, poor concentration, but without hallucinations or delusions, Vrylar increased to 3.0 (AR 573–74); **12-** March 22, 2019 therapy visit: spending more time with children, was more initiating and more independent per mother but increase emotional reactions, therapist notes "continues to meet medical necessity and is at risk of decompensation. . . she is currently being cared for by her mother." (AR 575); **13-** At the April 4, 2019 medication management visit: starting to feel her emotions again, tearfulness, but logical and linear thought process, no hallucinations or delusions, sleeps and eats well, rates her progress a 5/10 (AR 577); **14-** On April 25, 2019 medication management: same exam findings, no change from prior visit, but was noted to be more expressive (AR 579); **15-** May 5, 2019 therapy notes: presented with intense stare, tearful, reported inability to feel emotions (AR 581); **16-** May 24, 2019 therapy notes: presented teary eyed but smiling for the first time (AR 583); **17-** June 14, 2019 therapy visit: teary eyed and remained silent while children expressed their feelings (AR 669); **18-** July 8, 2019 therapy notes: presented as emotional, mother had to clarify her feelings, clinician noted she is still at risk of decompensation and being cared for by her mother (AR 587); **19-** July 9, 2019 medication management visit: alert and oriented x4, linear and logical thought process, no delusions or hallucinations, Wellbutrin added for depression (AR 674); **20-** July 30, 2019 medication management: same findings and continued on Vraylar and Wellbutrin (AR 590); **21**. September 10, 2019 medication management: stable with mood swings but still depressed, Wellbutrin was increased (AR 592); **22-** October 18, 2019 medication managemenr: alert and oriented x4, logical and linear thought process, reported depression improved with increased Wellbutrin dose, she had finally restarted driving, was now taking care of her children, and was no longer under her mother's care (AR 594); **23-** December 9, 2019 medication management: improving on increased Wellbutrin but still very sad, felt inadequate, not accepting her mental illness and impending divorce, presented with sad mood, congruent affect, crying spells, fair insight, fair judgment, but was noted to be stable and no longer cycling (AR 596); **24-** January 27, 2020, PCP visit reporting continued depression and anxiety with PHQ-9 depression scores in the severe range (AR 528);  **25-** January 30, 2020 mental health reassessment: noted she

was declined enrollment in CalWorks services due to mental health impairments,[4] she reported ongoing depressed mood and 100 weight gain in two years; sleep disturbance, low energy and motivation, poor concentration and memory; MSE noted clean a kept, cooperative, frequently tearful, "affect was content [sic] mood at full range and appropriate to the content of her speech," speech was clear, normal perception, oriented to time and place, normal cognition and judgment, good insight, assessed with schizoaffective disorder, bipolar type and was noted to require counseling and medication services to prevent decompensation. (AR 566–70).

Plaintiff contends the ALJ's discussion of this evidence was inadequate insofar as the ALJ cited only 3 medical record entries during the period of August 16, 2018 to January 30, 2020. Br. at 14, Doc. 17.

At the outset, it is worth noting that Plaintiff's contention is incorrect. In the paragraph immediately preceding the discussion to which Plaintiff refers, the ALJ in fact cited 22 entries from Plaintiff's primary care physician Dr. Aghaie at Apex Medical Group (Ex. 2F, 5F, 9F), at least half of which were dated during the time period in question, which is the alleged "closed period of disability" existing between August 16, 2018 and January 30, 2020. *See* AR 29 (citing (Ex. 2F/7,9,14,16,21,26,28,31; 5F/6,8,14,17,20,22; 9F/12,19,22,30,33,40).

As Defendant and the ALJ emphasize, during these PCP appointments "the claimant reported symptoms of depression and anxiety, but she routinely had mild or normal mental status exam findings, with good judgment and normal recent/remote memory noted," and she was noted as stable on two occasions. AR 29. However, these were abridged psychiatric findings from a general internist who was managing unrelated conditions including psoriasis, obesity and back pain. As explained above, prior to Plaintiff's August 2018 manic episode and inpatient stay, Dr. Aghaie was also treating Plaintiff's anxiety with Lexapro. After this episode it was Merced County Mental Health that was managing Plaintiff's psychiatric medications and care, including Lexapro, and

---

[4] Plaintiff asserts the ALJ ignored this fact, however the cited record does not necessarily establish that she was declined enrollment in Calworks due to her mental health as this was contained in her report to the clinician. Further, it is not clear what the significance of this fact is.

provided more detailed and comprehensive mental status examination findings. Plaintiff was also regularly being seen by a therapist as a part of that treatment team who took detailed and extensive notes as summarized above.

Collectively, Plaintiff attended at least 26 appointments over the 17-month period in question between psychiatry and therapy at Merced County Mental Health. Simply put, the recycled and abridged psychiatric findings of Plaintiff's PCP as to mood, judgment and memory (Exs. 2F, 5F, 9F) have relatively minimal evidentiary value compared to the detailed contemporaneous records of an inpatient psychiatric institution and an outpatient psychiatric treatment team at Merced County Mental Health (Exs. 3F, 4F, 6F, 8F) which Plaintiff visited at least 26 times over 17 months.

As to the latter records, the ALJ's discussion was quite limited. The ALJ did acknowledge the 3-day inpatient stay due to auditory hallucinations after which she received treatment through Merced County Department of Mental Health. The ALJ explained as follows:

> At times, the claimant presented with hallucinations and other psychotic symptoms. However, these symptoms appeared to stabilize with medication. For instance, during an October 2018 appointment, the claimant presented with racing thoughts and she was noted to be delusional, with limited insight and impaired judgement (Ex. 3F/64). She was treated with medication adjustments. During a December 2018 appointment, the claimant's mother reported the claimant improved quickly with her current medication, and she was much calmer and no longer psychotic (Ex. 3F/70). On exam, the claimant had a normal appearance with good grooming and eye contact. She was cooperative attentive and responsive. Her mood was depressed but she no longer had hyper-verbal or tangential/circumstantial speech/language (Ex. 3F/70).

However, the ALJ failed to recognize that despite improved manic symptoms at the December 2018 exam Plaintiff's mother noted her depression had worsened. Shifting from one extreme of the bipolar spectrum to the other (manic to depressive) does not result in a net gain in functionality. Moreover, a patient may improve in one respect while worsening in the other as noted by the clinician that a depressive phase commonly follows improvement in manic symptoms,

in which case they would initiate Wellbutrin for depression.  AR 497–98.

The ALJ continued:

> Throughout 2019, the claimant continued received individual counseling, during which she reported schizoaffective related symptoms, including mood swings, delusions, hallucinations, excessive disorganized speech, and irritability (Ex. 4F/14; 6F). However, medication adjustments were made and improvement was routinely noted throughout treatment. During a March 2020 therapy session, the claimant was dressed appropriately; she had a calm and friendly affect and she denied suicidal thoughts. She reported she was stable on medication and there were no adverse side effects. She further reported that she still felt depressed but she felt much better on medication (Ex. 6F/41).

Again, the ALJ's reliance on non-specific "improvement [that] was routinely noted throughout the record" is not a particularly helpful observation, particularly in the case of a bipolar disorder.  The broad generalization was also insufficiently supported by a citation to the record. For example, the ALJ describes one exam from March 2020 despite innumerable exams between August 2018 and January 2020 as summarized above. The ALJ's oversimplification of these treatment records fails to recognize that despite seemingly sustained improvements in manic symptoms, the records appear to suggest only fleeting improvement in depressive symptoms. Further, the notion that Plaintiff's symptoms routinely improved following medication adjustments is somewhat belied by the sheer number and variety of medication adjustments, including adding and discontinuing Lexapro, adding and discontinuing Zyprexa, adding and discontinuing Geodon, adding Wellbutrin, adding Vraylar, increasing the dose of Wellbutrin and increasing the dose of Vraylar.

Finally, as Defendant emphasizes, the ALJ added the following:

> Recent records show the claimant has experienced a positive response to medication therapy and therapy, and her symptoms appear reasonably stable. For instance, during a January 2020 appointment, the claimant the claimant continued to report ongoing depression and anxiety (Ex. 8F/144). However, on exam, her speech was clear and unremarkable; affect was congruent to mood and mood was unremarkable; thoughts/perception was normal and insight and judgment were good (Ex. 8F/146). Similarly, during a May 2021 follow-up, the claimant had a relatively unremarkable mental status exam. She reported she was doing well and just needed medication

> refills. No changes were made to her medication and she was advised to follow up in three months (Ex. 8F/134).

Here, the ALJ misidentified the date of the January 2020 appointment which was actually dated January 26, *2021* (AR 757), leaving little discussion of the records dating from August 2018 to January 2020, which was not rectified by the citation to a May 2021 exam.

Notably, elsewhere in the decision the ALJ appeared to concede that the records from 2018 through 2019 were anomalous in some respects. The ALJ also rejected the opinion of the non-examining psychiatric consultant, Dr. Sampson, that Plaintiff had only mild limitations in some areas of mental functioning. In so concluding, the ALJ explained as follows:

> Further, this opinion is not consistent with the mental status exam findings, <u>particularly those in 2018-2019, where the claimant presented with limited insight and judgment, as well as impaired speech due to hallucinations and delusions</u>. Overall, the record supports moderate limitations in all four areas of mental functioning, with correlating residual functional capacity limitations, including in the area of adapting/managing oneself.

AR 32 (emphasis added).

Although the ALJ appeared to recognize the importance of these records, a more thorough discussion by the ALJ was needed than was provided.

Defendant further emphasizes at some length the ALJ's analysis of therapy records from 2017 with LMFT Stark (Resp. at 4), but this is not responsive to Plaintiff's claim on appeal, namely a closed period of disability during the period of August 16, 2018 to January 30, 2020. Defendant also discussed at some length the ALJ's analysis of Plaintiff's physical RFC, including strength, gait, and range of motion. Resp. at 5–6. Again, this is not responsive to Plaintiff's claim on appeal that her <u>mental impairments</u> support a closed period of disability from August 2018 to January 2020.

Remand is therefore appropriate for the ALJ to reevaluate the mental health evidence during the period of August 16, 2018 to January 30, 2020, to determine whether it supports a closed period

of disability.

### B. Subjective Complaints

#### 1. Applicable Law

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10. Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

As the Ninth Circuit recently clarified in *Ferguson*, Although an ALJ may use "*inconsistent* objective medical evidence in the record to discount subjective symptom testimony," the ALJ "cannot effectively render a claimant's subjective symptom testimony superfluous by demanding positive objective medical evidence fully corroborating every allegation within the subjective testimony." *Ferguson v. O'Malley*, 95 F.4th 1194, 1200 (9th Cir. 2024) (emphasis in original).

In addition to the objective evidence, the other factors considered are: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and

aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment other than medication; 6) other measures the claimant uses to relieve pain or other symptom; 7)) Other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c)(3).

### 2. **Analysis**

Plaintiff's second claim of error overlaps to a large extent with the first insofar as Plaintiff appears to identify her testimony only as another piece of evidence in support of her closed period of mental disability during the period of August 16, 2018 to January 30, 2020.  But in terms of content, the testimony she summarizes somewhat mirrors most, if not all, of the statements she made to her clinicians and therapists as summarized above.  Further, her testimony, in contrast to the statement made to her clinicians, is not as readily applicable to specific dates or discrete periods of time and as such it is somewhat ill-suited to her claim of error on appeal.

Finally, Plaintiff contends that the ALJ reached faulty conclusions about her activities of daily living by failing to acknowledge that Plaintiff's activities were generally limited to the home and, when not limited to the home, required that she be accompanied by another family member such as her children accompanying her to the store, or her mother accompanying her to her medical appointments.  The argument is reasonably well taken in that the circumstances of her daily activities appear to have been overlooked by the ALJ.  Plaintiff also contends that the ALJ failed to acknowledge Plaintiff's drowsiness as a side effect of her medications, and indeed no such discussion is apparent in the ALJ's decision.

In sum, having already identified a basis for remand additional discussion of this issue is not necessary as all of Plaintiff's statements, whether offered to her treating providers at the initial hearing, or at her future re-hearing, will be subject to reconsideration on remand.

### VI. **Findings**

Remand is appropriate for the ALJ to conduct a new hearing and issue a new decision. Specifically, the ALJ should reconsider all evidence concerning Plaintiff's mental health during the period between August 16, 2018 and January 30, 2020, and determine whether the record supports a closed period of disability. Particular attention should be given:: **1-to** the records from Marie Green Psychiatric Center and Merced County Mental Health (Exs. 3F, 4F, 6F, and 8F); **2-to** Plaintiff's depressive symptoms and potential worsening thereof in the months following the addition of antipsychotics, and this notwithstanding that those antipsychotics improved her manic symptoms; and **3-to** side effects caused by her medication, chiefly drowsiness.

### VII. <u>Recommendations</u>

For the reasons stated above, the recommendation is as follows:

1. That Plaintiff's motion for summary judgment (Doc. 17) be **GRANTED.**
2. That Defendant's cross-motion (Doc. 19) be **DENIED.**
3. That the matter be remanded to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the Findings and Recommendations.
4. That the Court Clerk of Court be directed to enter judgment in favor of Plaintiff Shannon Marie Salado and against Defendant Commissioner of Social Security.

### VIII. <u>Objections Due Within 14 Days</u>

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these Findings and Recommendations, any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834,

838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **July 22, 2024**             **/s/ Gary S. Austin**
                                     UNITED STATES MAGISTRATE JUDGE